IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CLAYTON PRINCE TANKSLEY,

Plaintiff,

v.

LEE DANIELS, et al.,

Defendants.

CIVIL ACTION
NO. 16-0081

## TABLE OF CONTENTS

I.       INTRODUCTION ................................................................................................ 1

II.      BACKGROUND ................................................................................................. 2

III.     STANDARD OF REVIEW ................................................................................ 4

IV.      ANALYSIS ......................................................................................................... 6

    A.   Plaintiff Has Not Plausibly Alleged a Claim of  Copyright
       Infringement Against Fox Defendants ................................................. 6

       1.   Summary of the Two Works ............................................................. 8

       2.   Substantial Similarity Analysis ....................................................... 18

    B.   Plaintiff Has Not Plausibly Alleged a Claim of Contributory
       Copyright Infringement Against Sharon Pinkenson and the
       Greater Philadelphia Film Office ...................................................... 33

    C.   Plaintiff Has Not Plausibly Alleged a Claim of Negligence
       Against  Sharon Pinkenson and the Greater Philadelphia Film Office ........ 37

       1.   Plaintiff's Negligence Claim is Preempted by the Copyright Act ................... 37

       2.   Plaintiff Has Not Plausibly Alleged a Claim of Negligence ........................... 42

i

**D.** **Plaintiff Has Not Plausibly Alleged a Claim of Intentional Misrepresentation Against Lee Daniels**........................................ 43

**E.** **Plaintiff Has Not Plausibly Alleged a Claim of Negligent  Misrepresentation Against Lee Daniels** .......................................... 48

**F.** **Plaintiff Has Not Plausibly Alleged a Claim of Contributory Copyright Infringement Against Leah Daniels-Butler** .................................. 50

**V.** **CONCLUSION** ...................................................................................... 51

<u>**OPINION**</u>

**Slomsky, J.**                                                              **April 28, 2017**

## I.     INTRODUCTION

Plaintiff Clayton Prince Tanksley brings this action against numerous Defendants alleging that they infringed on his copyrighted work titled *Cream* by creating and using copyrighted materials to produce the television series *Empire*.  (Doc. No. 45.)  The Defendants in this case can be divided into two identifiable groups.  The first one consists of the "Fox Defendants." Included in this group are Lee Daniels, Lee Daniels Entertainment, Leah Daniels-Butler, Danny Strong, Danny Strong Productions, Twenty-First Century Fox, Inc., Fox Entertainment Group, Inc., Twentieth Century Fox Film Corp., Twentieth Century Fox Television, Inc., Twentieth Television, Inc., Twentieth Century Fox International, Twentieth Century Fox International Television, LLC, Twentieth Century Fox Home Entertainment, LLC, Fox Networks Group, Inc., Fox Broadcasting Company, Fox Television Stations, Inc., Fox Digital Media, and Fox International Channels.  The second group has two Defendants: Sharon Pinkenson and the Greater Philadelphia Film Office ("GPFO").

In Count I of the Second Amended Complaint ("SAC"), Plaintiff alleges that Fox Defendants directly infringed on his copyrighted work *Cream* by producing the television series *Empire*.  (Doc. No. 45 at ¶¶ 42-56.)  In Count II, Plaintiff alleges a contributory copyright infringement claim against Sharon Pinkenson and GPFO, and in Count III, a negligence claim against the same Defendants.  (<u>Id.</u> at ¶¶ 57-70.)  In Counts IV and V respectively, Plaintiff alleges intentional and negligent misrepresentation claims against Lee Daniels.  (<u>Id.</u> at ¶¶ 71-79.) Finally, in Count VI, Plaintiff alleges that Leah Daniels-Butler committed contributory copyright

infringement.  (Id. at ¶¶ 79-86.)  Defendants have filed two Motions to Dismiss the SAC in its entirety.  (Doc. Nos. 53-54.)  The Motions are now ripe for disposition.[1]

## II.    BACKGROUND

In 2005, Plaintiff Clayton Prince Tanksley wrote, filmed, and produced a three episode television series titled *Cream* about an African American man "who has overcome a disadvantaged . . . past to achieve financial success in the music industry, only to be exploited by those closest to him."  (Doc. No. 45 at ¶ 41(A).)  On September 23, 2005, Plaintiff obtained a registration of *Cream* from the United States Copyright Office.  (Registration Number Pau3-002-354.)  He then set about marketing his copyrighted work with the hope of making a hit television show or movie.  Through these efforts, Tanksley learned about an event called Philly Pitch, where "writers and potential producers [were presented with] an opportunity to pitch their film concepts to a panel of entertainment industry professionals who act as 'judges.'"  (Doc. No. 45 at ¶ 31.)  The Greater Philadelphia Film Office ("GPFO") and its Executive Director, Sharon Pinkenson, organized this event.  (Id. at ¶ 32.)   Lee Daniels participated as one of the judges.  (Id. at ¶ 31.)

On April 5, 2008, Tanksley attended Philly Pitch.  (Id.)   He presented one copyrighted work, titled *Kung Fu Sissy*, to the panel of judges.[2]   (See Doc. No. 53, Ex. B.)   After each

---

[1] In reaching a decision, the Court has considered the SAC (Doc. No. 45), Defendants' Motions to Dismiss the SAC (Doc. No. 53-54), Plaintiff's Responses in Opposition (Doc. No. 57-60), Defendants' Replies (Doc. Nos. 62-63), oral argument on the Motions to Dismiss (See, e.g., Doc. No. 69), and the parties' supplemental briefing (Doc. Nos. 80-84).  The Court has also considered the DVDs of *Cream* and *Empire*, which were attached as exhibits to Plaintiff's SAC and Defendants' Motions to Dismiss, respectively.

[2] In the SAC, Plaintiff alleges that he "pitched not just one, but two different works" to the panel—*Kung Fu Sissy* and *Cream*.  (Doc. No. 45 at ¶ 34.)  This allegation, however, is disproved by a video recording of Philly Pitch, which clearly shows that Plaintiff pitched only *Kung Fu Sissy* to the panel of judges, not *Cream*.  (Doc. No. 53, Ex. B.)

presenter pitched an idea to the panel, the participants broke for informal discussions and networking. At that time, Plaintiff alleges that he and Daniels privately discussed *Cream*. (Doc. No. 45 at ¶¶ 35-36.) Tanksley gave Daniels several copies of a DVD containing his copyrighted work, along with a written script of the show. (Id. at ¶ 36.) His goal was to work with Daniels to produce *Cream* as a hit television show. (Id.)

Nearly seven years later, on January 7, 2015, Fox aired a pilot episode of its new television series titled *Empire*, which features the struggles of Lucious Lyon, a rapper and former drug dealer who founded one of the world's leading media companies, Empire Entertainment, with his ex-wife Cookie Lyon. (Id. at ¶ 37.) This soap opera chronicles Lucious and Cookies' fight for control over Empire Entertainment, vicariously waged through a succession battle among their three adult sons. (Doc. No. 53 at 3.)

Lee Daniels and Danny Strong are the creators of *Empire*. (Id. at ¶ 37.) Plaintiff alleges that Daniels and Strong surreptitiously took his copyrighted work and were "knowingly and willfully involved in the unauthorized copying of 'Cream'" in connection with the creation of *Empire*. (Id. at ¶ 46.) Plaintiff avers that after the airing of *Empire*, he was unable to

---

When considering a motion to dismiss, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006). The court may also consider certain documents not made part of the complaint. Miller v. Cadmus Communications, No. 09-2869, 2010 WL 762312, at *2 (E.D. Pa. Mar. 1, 2010). For example, a court may consider "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." Pension Benefit Guaranty Corp. v. White Consolidated Indus., 998 F.2d 1192, 1196 (3d Cir. 1993).

Here, the Court will consider the video recording of Philly Pitch. The video is "undisputably authentic" and a "document" upon which Plaintiff's claims are based. Pension Benefit Guaranty Corp. v. White Consolidated Indus., 998 F.2d 1192, 1196 (3d Cir. 1993). Plaintiff subpoenaed the video directly from Robert Kates, the creator and custodian of the video who was hired by GPFO to film the event. (Doc. No. 45 at ¶ 35.) In addition, Plaintiff's claims are based on his alleged pitch of *Cream* to the panel of judges and to Lee Daniels in particular.

successfully market *Cream* to any television network "due to its striking similarities to 'Empire.'"  (<u>Id.</u> at ¶ 41.)

On January 8, 2016, Plaintiff initiated this action.  (Doc. No. 1.)  He filed an Amended Complaint on January 29, 2016.  (Doc. No. 3.)  On June 17, 2016, Defendants filed two Motions to Dismiss the Amended Complaint.  (Doc. Nos. 21, 25.)  The Court held a hearing on Defendants' Motions to Dismiss on June 2, 2016.  (Doc. Nos. 41-42.)  At the hearing, this Court afforded Plaintiff another opportunity to amend the Amended Complaint.  On August 1, 2016, Plaintiff filed the Second Amended Complaint ("SAC").  (Doc. No. 45.)  Upon the filing of the SAC, the Court denied Defendants' pending Motions to Dismiss without prejudice as moot. (Doc. No. 46.)

On September 30, 2016, Defendants filed another two Motions to Dismiss the SAC. (Doc. Nos. 53-54.)  Plaintiff filed Responses in Opposition on October 30, 2016.  (Doc. Nos. 57-60.)  On November 14, 2016, Defendants filed Replies.  (Doc. Nos. 62-63.)  This Court held a hearing on the Motions to Dismiss the SAC.  (<u>See</u> Doc. No. 69.)   At the hearing, the Court granted the parties leave to file supplemental briefs in support of their positions.  (<u>Id.</u>)  On March 27, 2017, Plaintiff and Defendants filed supplemental briefs on the Motions to Dismiss (Doc. Nos. 80-84), which is now ripe for a decision.

## III.    STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set forth in <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009).  After <u>Iqbal</u> it is clear that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" to defeat a Rule 12(b)(6) motion to dismiss.  <u>Id.</u> at 663; <u>see also</u> <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544 (2007).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  <u>Ethypharm S.A.</u>

France v. Abbott Labs., 707 F.3d 223, 231 n.14 (3d Cir. 2013) (citing Sheridan v. NGK Metals Corp., 609 F.3d 239, 262 n.27 (3d Cir. 2010)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Applying the principles of Iqbal and Twombly, the Third Circuit in Santiago v. Warminster Twp., 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (quoting Iqbal, 556 U.S. at 675, 679). "This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'shown' — 'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679. The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

## IV.    ANALYSIS

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants seek to dismiss the SAC in its entirety. (Doc. Nos. 53-54.) The Court will address each of Plaintiff's claims in turn.

### A.    Plaintiff Has Not Plausibly Alleged a Claim of Copyright Infringement Against Fox Defendants

In Count I of the SAC, Plaintiff alleges that the Fox Defendants directly infringed on his copyrighted work titled *Cream* by producing the television series *Empire*.[3] (Doc. No. 45 at ¶¶ 42-56.) "Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer . . . ." 17 U.S.C. § 501(a). To state a claim of copyright infringement, a plaintiff must establish ownership of a valid copyright, and unauthorized copying of protectable elements of the plaintiff's copyrighted work. Tanikumi v. Walt Disney Co., 616 F. App'x 515, 519 (3d Cir. 2015). Proof of unauthorized copying can be found either in the defendant's admission or, as is more often the case, by circumstantial evidence of access and substantial similarity. Dam Things from Denmark, a/k/a Troll Co. ApS v. Russ Berrie & Co., Inc., 290 F.3d 548, 561 (3d Cir. 2002). To determine whether the works are substantially similar, a court "compares the allegedly infringing work with the original work, and considers whether a 'lay-observer' would believe that the copying was of protectable aspects of the copyrighted work."[4] Jackson v. Booker, 465 F. App'x 163, 165 (3d Cir. 2012).

---

[3]  As previously noted, Plaintiff refers to the following individuals and entities collectively as the "Fox Defendants:" Lee Daniels, Lee Daniels Entertainment, Leah Daniels-Butler, Danny Strong, Danny Strong Productions, Twenty-First Century Fox, Inc., Fox Entertainment Group, Inc., Twentieth Century Fox Film Corp., Twentieth Century Fox Television, Inc., Twentieth Television, Inc., Twentieth Century Fox International, Twentieth Century Fox International Television, LLC, Twentieth Century Fox Home Entertainment, LLC, Fox Networks Group, Inc., Fox Broadcasting Company, Fox Television Stations, Inc., Fox Digital Media, and Fox International Channels. (Doc. No. 45 at ¶ 17.)

[4]  Plaintiff contends that the Court should not compare the two works to assess whether they are substantially similar at the motion to dismiss stage. It is well established, however, that a

This inquiry involves distinguishing between protectable and unprotectable aspects of the copyrighted work. Kay Berry, Inc. v. Taylor Gifts, Inc., 421 F.3d 199, 208 (3d Cir. 2005). "It is a fundamental premise of copyright law that an author can protect only the expression of an idea, but not the idea itself." Id. Accordingly, a court must discern "the author's expression and the idea or theme that he . . . seeks to convey or explore," because the former is protected and the latter is not. Id.; see also Winstead v. Jackson, 509 F. App'x 139, 143 (3d Cir. 2013) (citations omitted) ("The court must determine whether the allegedly infringing work is similar because it appropriates the unique expressions of the original work, or merely because it contains elements that would be expected when two works . . . explore the same theme.").

In analyzing the two works for substantial similarity, the court compares aspects such as plot, characters, theme, mood, setting, and dialogue. See, e.g., Tanikumi, 616 F. App'x at 521 (comparing plot, theme, setting, and characters, among other aspects, to determine if there was substantial similarity between the allegedly infringing work and the original copyrighted work). Without meticulously dissecting the works, a court's task is to compare the works' "total concept and overall feel . . . as instructed [by] good eyes and common sense." Peter F. Gaito Architecture, LLC v. Simone Development Corp., 602 F.3d 57, 66 (2d Cir. 2010).

---

district court may consider items that are integral to the complaint on a motion to dismiss. See In re Rockefeller Ctr. Props. Inc. Sec. Litig., 184 F.3d 280, 287 (3d Cir. 1999). Moreover, "[a]lthough the question of substantial similarity is one of fact, a district court is permitted to consider the disputed works in deciding a Rule 12(b)(6) motion." Tanikumi v. Walt Disney Co., 616 F. App'x 515, 519 (3d Cir. 2015); see also Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 64 (2d Cir. 2010) (explaining that "[w]hen a court is called upon to consider whether the works are substantially similar, no discovery or fact-finding is typically necessary, because what is required is only a visual comparison of the works"). In this case, because Plaintiff's three episode television series of *Cream* and Fox Defendants' *Empire* series were integral to the SAC and part of the record before the Court, the Court will consider the works to determine whether Plaintiff has sufficiently alleged a claim for copyright infringement.

Here, Fox Defendants do not contest that Plaintiff held a valid copyright for *Cream*, and that Plaintiff has adequately pled access. (Doc. No. 54 at 23 n.12.) Rather, they argue that Plaintiff has failed to plead facts showing that the two works are substantially similar. (Id. at 23.) In contrast, Plaintiff argues that he has stated a claim for copyright infringement because the two works are substantially similar in plot, characters, theme, mood, and setting.[5] (Doc. No. 60 at 10-24.) For reasons that follow, this Court agrees with Fox Defendants that *Empire* does not infringe on the expressions embodied in *Cream*.

### 1. Summary of the Two Works

To determine whether *Cream* and *Empire* are substantially similar, it is helpful first to summarize the content of the two works.

### a. Summary of *Cream*

Plaintiff's copyrighted work titled *Cream* can be summarized as a television show that follows the trials and tribulations of Winston St. James, an African-American hip-hop mogul who runs a record label called Big Balla Records. (Doc. No. 45 at ¶ 41.) Throughout the three episode series, viewers watch Winston St. James manage artists who seek contracts with the label, attempt to save his sister (who is actually his daughter) from an abusive relationship, attend the funeral of his mother, and dismiss his father's request to co-own the record label. Additionally, *Cream* features extensive sexual scenes, in which Winston engages in sex with multiple partners, contracts herpes, and seeks solace in a prostitute.

Episode one of *Cream* opens with Winston having sex with his two married assistants, Tiffany and Chantal. (*Cream* DVD at 0:44-1:46.) In the next scene, Winston arrives late to a dance studio where he is scheduled to hear a rap group's audition. (Id. at 1:48-2:49.) As the rap

---

[5] Plaintiff does not allege that *Cream* and *Empire* contain substantially similar sequences of dialogue. (See Doc. No. 45 at ¶¶ 47(A)-(F).)

group performs a song, the scene fades to an extended fantasy sequence in which Winston has sex with yet another woman, Joy, who is a member of the rap group's entourage.  (Id. at 2:50-5:16.)

The next scene takes a dramatic shift.  Winston's sister Angelica is beaten by her boyfriend Shekwan.  (Id. at 5:22-6:30.)  Shekwan asks Angelica to call Winston and set up an audition for him.  (Id. at 6:30-6:33.)  Angelica obliges.  (Id. at 6:50-7:30.)  Winston receives her call while in bed with Joy, and initially refuses to give Shekwan an audition, but then tells Angelica to meet him in his office to discuss it.  (Id. at 7:30-8:08.)  The next day, Angelica arrives at Winston's office wearing sunglasses.  (Id. at 8:24-8:38.)  Winston asks Angelica to take off the sunglasses, revealing a black eye, which she presumably got from the abusive Shekwan.  (Id. at 8:39-9:35.)  At that moment, Winston decides to give Shekwan an audition after all, hatching a plot to exact revenge on the man who is hurting his little sister.  (Id. at 9:36-10:01.)  After Angelica leaves the office, Winston grabs his groin and calls his secretary, asking that she schedule an urgent appointment with his doctor.  (Id. at 10:18-10:26.)

In the next scene, Shekwan auditions for Winston in the dance studio.  (Id. at 10:38-12:30.)  The audition is horrendous, yet Winston signs Shekwan to the record label anyway.  (Id. at 12:30-12:59.)  After the audition, Winston asks Angelica to join him for dinner, so that she is away from Shekwan.  (Id. at 13:08-13:39.)  Then he gestures to two men in the studio, suggesting that they can now go forward with a plan to take out revenge on Shekwan.  (Id. at 13:40-13:47.)

The scene then shifts to later that night, where Shekwan walks down an alleyway talking on the phone about his new contract with the record label.  (Id. at 13:54-12:59.)  As Shekwan urinates on a dumpster, the two men lurk in the darkness and shoot Shekwan.  (Id. at 14:25-

14:50.)  The men then enter the frame and kick him, checking that Shekwan is dead.  (Id. at 14:55-15:14.)  The credits roll.  Thereafter, episode one concludes with a public service announcement from the actress who plays Angelica, who warns of the dangers of domestic violence and offers resources for those who need help escaping from an abusive relationship.  (Id. at 15:48-16:46.)

Next, in episode two of *Cream*, Winston learns from Angelica that Shekwan survived the shooting.  (Id. at 17:44-18:19.)  He berates the two hit men for failing to finish the job.  (Id. at 18:19-19:11.)  The next scene shifts to a doctor's office, where Winston is informed that he has herpes, a non-fatal disease.  (Id. at 19:26-22:03.)  The scene cuts to one of Winston's sexual partners, Chantal, having sex with her husband.  (Id. at 22:06-22:53.)  After having sex, Chantal appears to be in pain, apparently experiencing the symptoms of herpes.  (Id. at 23:45-23:56.)

The next day, Winston and Tiffany meet in the office.  (Id. at 23:58-24:33.)  Tiffany tells Winston that she and Chantal both are feeling under the weather, suggesting to the audience that they are all feeling the effects of herpes.  (Id.)

In the next scene, Angelica sits beside Shekwan's hospital bed, praying for his recovery.  (Id. at 25:45-26:22.)  Winston arrives and suggests that Angelica leave and get some rest.  (Id. at 26:22-27:21.)  Alone in the hospital room with Shekwan, Winston threatens the man, even though he appears to be in a coma.  (Id. at 27:41-28:46.)  As Winston leaves, however, the camera cuts to Shekwan opening his eyes.  (Id. at 28:46-28:57.)

Back at the office, Winston contemplates his herpes diagnosis, detailing his sexual encounters through various flashbacks.  (Id. at 29:00-29:49.)  Looking forlorn, he begrudgingly takes herpes medication.  (Id.)  Next, one of Winston's artists interrupts him in the bathroom demanding more money for his record sales, but Winston pulls out a gun and refuses to pay him.

(<u>Id.</u> at 29:53-31:15.)  In the meantime, Winston's mother Nora arrives at the office with Angelo, who is introduced as Winston's brother.  (<u>Id.</u> at 31:19-32:54.)  Angelo is developmentally disabled and has trouble speaking coherently, referring to himself in the third person.  (<u>Id.</u> at 31:52-32:16.)  Nora explains that Winston's father, Sammy, is currently dating Winston's ex-girlfriend Brenda. (<u>Id.</u>)

In the following scene, Sammy and Brenda are sitting on the couch and talking in Sammy's apartment.  (<u>Id.</u> at 32:56-34:02.)  Through their conversation, the audience learns that Angelica and Angelo are really Brenda and Winston's children—not his younger siblings.  (<u>Id.</u>)  Winston's mother raised Angelica and Angelo as her own children after Brenda was sent away for her drug problem.  (<u>Id.</u>)  Sammy and Brenda also discuss how Sammy is going to take over Big Balla Records and Brenda is going to "get her kids back."  (<u>Id.</u>)  The scene ends heavily suggesting that Sammy and Brenda will have sex.  (<u>Id.</u> at 34:03-34:21.)

Episode two then concludes with a lengthy public service announcement wherein Plaintiff Tanksley, the actor who plays Winston, talks about herpes, its statistics and its symptoms.  (<u>Id.</u> at 34:59-36:43.)  He recommends getting tested for herpes and other sexually transmitted diseases.  (<u>Id.</u>)

The third and final episode of the *Cream* pilot opens with a rapper recording in the studio.  (<u>Id.</u> at 38:00-39:13.)  While in the studio, Winston receives a call from Angelica, informing him that Shekwan is "going to make a fully recovery."  (<u>Id.</u> at 39:15-40:15.)

In the following scene, Nora, Winston's mother, arrives at Sammy's apartment to confront him about his affair with Brenda.  (<u>Id.</u> at 40:20-41:20.)  Nora follows Brenda out of the apartment, where they have a confrontation in a parking lot.  (<u>Id.</u> at 41:20-42:28.)  Nora has a heart attack and dies.  (<u>Id.</u>)  At her funeral, Sammy demands that he take over the share of Big

Balla Records that Nora owned (50%), which had not been revealed in the storyline until this point. (Id. at 43:00-45:22.) Winston refuses and storms off. (Id.)

After a lengthy sequence of Winston driving around, the audience sees him pick up a prostitute named Regina, and they go to her apartment. (Id. at 45:38-45:22.) However, Winston is too upset by his mother's death to have sex. (Id.)

Next, Winston watches as Shekwan records a song called "Biscuits and Gravy," which is meant to be comically bad. (Id. at 50:30-52:41.) However, to Winston's chagrin, the song becomes a hit. In the following scene, Winston, Chantal, and Tiffany deal with the herpes outbreak in the office. (Id. at 53:01-54:15.) Chantal admits to Winston that she has herpes, but Winston denies being infected. (Id.) Therefore, Chantal blames Tiffany for spreading herpes to the group and they get into an altercation. (Id.) When Chantal later admits to her husband that she has herpes, he kicks her out of their apartment. Chantal goes to Winston's home and asks to stay with him, and the two have sex.

The scene then cuts to Sammy's apartment, where Brenda and Sammy are engaging in sexual acts. (Id. at 54:18-55:39.) Sammy is upset that Angelica and Angelo received all of Nora's shares of Big Balla Records. (Id.) Sammy decides that he and Brenda should reveal to Angelica and Angelo who their parents really are. (Id.) In this way, Sammy will be able to control their shares of Big Balla Records. (Id.)

Later, Sammy and Brenda reveal to Angelica who her parents really are. (Id. at 104:37-108:41.) Upset at the news, Angelica calls Winston and says that she never wants to see him again. (Id.) Distraught, Winston goes to Regina's apartment, seeking solace in the prostitute. (Id. at 109:00-111:15.) While there, he reveals the truth about Angelica and Angelo, and his herpes diagnosis. (Id.) Regina confesses that she also has herpes. (Id.) Minutes later, Chantal's

husband stops by Regina's apartment for a date. (Id.) At that moment, Winston realizes that Chantal's husband must have infected her with herpes, and that Chantal must have spread the disease to Winston and Tiffany. (Id.)

At the conclusion of the pilot, the actress who plays Nora offers a public service announcement on the benefits of adoption. (Id. at 111:54-112:49.) She says that there is an "epidemic across America of grandparents rearing grandchildren, in many cases with special needs, because of the parents' problems," and encourages adoption of those children who "don't have grandparents to rescue them." (Id.)

### b. Summary of *Empire*

The allegedly infringing work titled *Empire* can be summarized as a television soap opera "reveling in the intrigue, power struggles and opulent excesses of a powerful and wealthy family"—the Lyons. (Doc. No. 54 at 3.) *Empire* tells the story of Lucious Lyon and his ex-wife Cookie Lyon, who rose from a criminal past of drug dealing to create a leading music label and entertainment company called Empire Entertainment. (Id.) The show details the couples' fight for control of the company, and chronicles a *King Lear*-style succession rivalry among their three sons—Andre, Jamal, and Hakeem—who each want to succeed their father in running the family business. (Id.)

The pilot episode of *Empire* opens with Lucious Lyon, the family patriarch, sitting in a recording studio dissatisfied with the performance of one of his artists. (*Empire* DVD at 0:12-1:33.) As she sings, the scene cuts to stylized flashbacks of Lucious being examined by doctors who appear to be delivering bad news. (Id.) To get the performance he wants, Lucious emotionally manipulates the artist, telling her to recall the recent death of her brother. (Id. at

1:44-2:09.)  The performance that follows demonstrates how Lucious is both a genius record producer and a man who is willing to stop at nothing to get what he wants.  (Id. at 2:09-2:44.)

The next scene opens with a lavish party on a yacht anchored in New York harbor.  (Id. at 2:55-4:30.)  Lucious's sons Jamal and Hakeem improvise an upbeat musical performance, while their older brother Andre cynically looks down on them for showing off their talent to gain their father's affection.  (Id.)

The next scene cuts back to Manhattan where, greeted by a throng of paparazzi and fans, Lucious arrives at the skyscraper which is the headquarters of Empire Entertainment.  (Id. at 4:40-4:55.)  Lucious's faithful assistant Becky quickly meets him in the lobby and informs him of the days urgent matters before Lucious goes to a board meeting.  (Id. at 4:55-5:31.)  At the board meeting, he announces that Empire Entertainment has filed to become a publicly traded company.  (Id. at 5:32-6:40.)

Later, Lucious meets with his three sons at his mansion and tells them that he plans to select one of them to take over Empire Entertainment, but that none of them are ready yet.  (Id. at 6:46-8:05.)  Jamal, the middle child, asks "what is this *King Lear* now?," suggesting the narrative for the series.  (Id.)

The scene then cuts to prison gates opening and Cookie Lyon, the matriarch of the Lyon family, exiting the grounds.  (Id. at 8:08-8:33.)  The audience learns that Lucious's ex-wife Cookie was released after serving seventeen years in prison for charges associated with drug dealing.

At a boxing gym, Andre, the oldest son, tries to convince his father that he should take over the company.  (Id. at 8:40-9:50.)  Andre is a graduate of the Wharton School of Business and has helped his father with handling the finances of the company.  (Id.)  However, he is not

musically talented like his two younger brothers.  (Id.)  Andre tells his father that Cookie was released from prison. (Id.)  Hearing this news, Lucious asks Bunkie, his right hand man, to spy on her.  (Id. at 9:52-10:22.)  The audience later learns that Bunkie is in fact Cookie's cousin, and has been a long-time friend of the family.  Bunkie asks Lucious for $25,000 to cover his gambling debts, but Lucious refuses to pay for his habit.  (Id.)

The next scene opens to Jamal hanging out with his partner Michael in his spacious loft. (Id. at 10:25-14:00.)  Jamal tells Michael about his father's succession challenge, but believes that he will never be chosen because Lucious does not approve of his homosexuality and does not think that an openly gay man can be successful in the world of hip-hop music.  (Id.)  When the phone rings, Jamal answers and is shocked to hear that his mother Cookie is outside and wants to be buzzed in.  (Id.)  Through flashbacks, the audience learns that in stark contrast to her ex-husband, Cookie knew that Jamal was gay and has always supported him.  (Id.)

The audience then follows Cookie to Empire Entertainment's headquarters, where she drops by to visit with Lucious.  (Id. at 14:00-17:15.)  In Lucious's opulent office, Cookie demands half of the company, but Lucious says that this is not possible.  (Id.)  During their argument, the audience learns that Lucious and Cookie were both involved in drug dealing, and that Cookie pled guilty so that Lucious could pursue his music career and take care of their children.  (Id.)  Cookie feels that she is entitled to half of Empire Entertainment for her sacrifice, in part relying on the fact that the money used to create the company was the same drug money which landed her in prison.  Cookie then asks for an annual salary of $5 million and a position as head of Artists & Repertoire ("A&R").  (Id.)  Lucious says that he will support Cookie financially, albeit not by giving her an annual salary of $5 million, and that he cannot make her head of A&R because the position is already filled (with his girlfriend, Anika).  (Id.)  When

Anika enters the office, Cookie casually insults her and warns Lucious that he cannot sweep her under the rug.  (Id.)

Cookie then visits the high rise apartment of Hakeem, her youngest son.  (Id. at 17:24-18:50.)  Hakeem is disrespectful towards her, so she brutally beats him with a broom.  (Id.)

Later, Andre and his wife Rhonda discuss Lucious's succession ploy in their apartment.  (Id. at 24:44-26:00.)  Rhonda suggests that Andre pit his two younger brothers against one another, so that Andre will be the last man standing to take over Empire Entertainment.  (Id.)  As part of this strategy, Andre visits Cookie at her new apartment and recommends that she manage Jamal's career and make him a star, as a way to get leverage over Lucious.  (Id. at 26:00-27:57.)

Cutting to a modern conference room at the company's headquarters, Cookie interrupts Lucious's meeting to tell him that she wants to manage Jamal.  (Id. at 27:58-28:30.)  She threatens Lucious by telling him that she will leak to the Securities and Exchange Commission the fact that Empire Entertainment was created with drug money.  (Id. at 28:33-29:56.)  Lucious acquiesces.  (Id.)

The pilot then cuts to performances by Jamal and Hakeem, demonstrating their brotherly bond while also underscoring the mounting tension between them.  (Id. at 30:15-36:40.)  First, Jamal performs at a coffee shop.  (Id.)  Cookie tells him that he should share his talents with the world and start making hit records, but he initially refuses to let her manage his career.  (Id.)  Then, Hakeem has trouble recording a song for Lucious in the studio.  (Id.)  Hungover from the night before, he is unfocused and his performance suffers greatly.  (Id.)  To get back in his father's good graces, he visits Jamal, who helps him rework the song into a hit.  (Id.)

Later, Bunkie materializes at Lucious's mansion and demands $3 million.  (Id. at 36:40-37:44.)  He threatens Lucious by saying that he will tell the police about murders Lucious

committed many years ago.  (Id.)  Despite this threat, Lucious still refuses to give Bunkie any money.  (Id.)

The following scene shows Hakeem back in the studio performing the reworked song while Lucious and Jamal watch him perform.  (Id. at 37:48-36:40.)  Lucious is impressed with Hakeem's improvements.  (Id.)  Even though Hakeem tells his father that Jamal helped him rework the song, Lucious refuses to recognize Jamal's talents.  (Id.)  Frustrated by being constantly overlooked by his father because of his homosexuality, Jamal finally agrees to let Cookie manage his career.  (Id. at 38:51-39:18.)

The following scene shows Lucious at the doctor's office.  (Id. at 39:19-40:50.)  The doctor informs Lucious that he has Amyotrophic Lateral Sclerosis (ALS), a progressive and fatal neurodegenerative disease (also known as Lou Gehrig's disease).  (Id.)  The doctor tells Lucious he has three years to live, thus informing the audience of Lucious's rationale for the succession battle amongst his adult sons.  (Id.)

Later, Lucious meets with Bunkie under a highway overpass, where Bunkie is seen urinating in the river.  (Id. at 41:45-43:00.)  Because of Bunkie's attempts to blackmail Lucious, Luscious shoots Bunkie as they stand face to face.  (Id.)

In the final scene of the pilot episode, the entire family returns to the lavish party on the yacht.  (Id. at 45:05-45:55.)  Lucious announces Cookie's return to the company, and that Jamal and Hakeem will be releasing albums.  (Id.)  He closes with a toast "to the Empire."  (Id.)

In the remaining episodes of the first seasons of *Empire*, Lucious reveals to his family that he has ALS, becomes engaged to Anika, and continues to struggle with naming his successor.  Cookie continues to manage Jamal's career, and Jamal comes out publicly as being gay.  Andre has a manic episode and requires a brief period of hospitalization, while Hakeem

leaves and later returns to Empire Entertainment. In the season's final episode, Lucious learns that he does not have ALS after all, chooses Jamal as his successor, and is arrested for Bunkie's murder.

## 2. Substantial Similarity Analysis

As previously noted, to determine whether the works are substantially similar, a court "compares the allegedly infringing work with the original work, and considers whether a 'lay-observer' would believe that the copying was of protectable aspects of the copyrighted work." Jackson v. Booker, 465 F. App'x 163, 165 (3d Cir. 2012). Keeping in mind the "total concept and overall feel" of the two works at issue, a comparison based on plot, characters, theme, mood, setting, and dialogue, even when considered in the light most favorable to Plaintiff that what he contends is evidence of infringement, demonstrates that there is no substantial similarity between *Cream* and *Empire*. See Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 66 (2d Cir. 2010).

### a. Plot

Plaintiff first contends that the plots of *Cream* and *Empire* demonstrate that the two works are substantially similar. (Doc. No. 45 at ¶ 47(B).) Plaintiff specifically alleges that "in both shows, the male protagonist is forced to contend with family members who are claiming entitlement and scheming to take over 50% of his record label business, and exploiting his children in the effort." (Id.) Plaintiff also claims that less significant plot points about disease, urination, flashback scenes, female-female altercations, same-sex relationships, and secret parentage, all support a finding of substantial similarity. (Id.)

General plot ideas are not protected by copyright law. Berkic v. Crichton, 761 F.2d 1289, 1293 (9th Cir. 1985). A succession story is a far too general plot idea, and does not warrant protection. After viewing *Cream* and *Empire*, Plaintiff's allegation that that the main plot line in

both works deals with a succession story involving a fight for control over Big Balla Records (*Cream*) and Empire Entertainment (*Empire*) is inaccurate.  Moreover, this allegedly similar plot line is expressed in radically different ways.  For instance, in *Cream*, Winston's father Sammy, by all accounts a sideline character, wants to co-own Big Balla Records.  When Sammy is introduced at the end of the second episode, he mentions to Winston's ex-girlfriend Brenda that he is going to take his share of Big Balla Records.  Then, in the final episode of *Cream*, Sammy asks Winston to give him the 50% ownership stake in Big Balla Records that Winston's deceased mother held.

In this rendition of a succession story, Winston's father Sammy seeks to inherit half of a company which Winston's mother owned.  In other words, Sammy is trying to take for himself any share of the company which would have been passed to Winston, Angelica, or Angelo (as Nora's child and adopted grandchildren).  Sammy's sideline request to share control over Big Balla Records is overshadowed by major plot lines such as Winston's herpes diagnosis and the failed attempt to murder Shekwan, which are highlighted in all three episodes.

Unlike *Cream* where succession, if at all prevalent, is a side or minor plot line, the heart of the *Empire* series is its *King Lear*-style succession story.  In *Empire*, Lucious Lyon is motivated by his terminal illness to choose the right successor to take over the media behemoth Empire Entertainment.  In the pilot episode, he tells his three sons that he will choose one of them to run the company, but explains that none of them are ready yet.  The ensuing succession rivalry underscores the entire series.  It fuels almost every fight and scheme waged in the Lyon family.

The difference in expression of these stories is stark.  In *Cream*, Winston's father wants to inherit Nora's half of Big Balla Records and ultimately to take away from Winston, Angelica,

and Angelo their stake in the company. Conversely, in *Empire*, Lucious wants one of his three sons to prove that they can run Empire Entertainment and take his place as CEO of the company once he is gone. There is simply no similar plot line in *Cream*. For this reason, the plots of the two works are not substantially similar.

Plaintiff also contends that the two works have plot lines about disease, urination, flashbacks, female-female altercations, same-sex relationships, and secret parentage, which warrant a finding of substantial similarity. These purported similarities, however, have even less in common than the allegedly similar succession story.

Plaintiff asserts that the "identical plots about diseases" demonstrate substantial similarity. (Doc. No. 45 at ¶ 47(F)(6).) In *Cream*, Winston is diagnosed with herpes. This diagnosis of a non-fatal, sexually transmitted disease connects Winston's many sexual encounters and allows Plaintiff to issue a public service announcement about sexually transmitted diseases. In contrast, *Empire*'s Lucious is diagnosed with ALS, which unlike Winston's herpes diagnosis, is a fatal neurodegenerative disease. The discovery of ALS is the spark that ignites the entire succession rivalry among his three sons, and is the driving force behind the show. It is not meant to be used for moralistic messaging as Winston's herpes is used in *Cream*. In addition, unlike Winston's herpes diagnosis, which is discussed at length among several characters, Lucious's ALS diagnosis is initially kept secret from his family.[6] Because the expressions of disease are so different in *Cream* and *Empire*, this allegation does not support a finding of substantial similarity.

---

[6] Plaintiff contends that the fact that both Winston and Lucious have white female physicians shows substantial similarity. (Doc. No. 45 at ¶ 47(F)(2).) White female doctors are commonplace, both in the real world and on television (e.g., *Grey's Anatomy*, *ER*, and *General Hospital*). Moreover, a doctors' race and gender adds nothing to the storyline in either work. See Eaton v. National Broad. Co., 972 F. Supp. 1019, 1029 (E.D. Va. 1997), aff'd, 145 F.3d 1324 (4th Cir. 1998) (internal citation omitted) (stating that "basic human traits that certain

Plaintiff contends that both works involve a scene where a "victim is shot shortly after urinating outside." (Doc. No. 45 at ¶ 47(F)(6).) However, these two scenes are expressed in different ways. In *Cream*, Winston orders his two henchmen to murder Shekwan after learning of his abuse of Angelica. Shekwan is seen walking through a parking lot, and briefly urinating on a dumpster when he hears people lurking in the shadows. The audience then sees Shekwan receive several gunshot wounds. Only when a grievously injured Shekwan has fallen to the ground do the two shooters enter the frame.

Unlike *Cream*, where henchmen shoot and fail to kill the victim, in *Empire* Lucious himself commits the murder. Lucious shoots and kills his longtime friend Bunkie, not an enemy like Shekwan in *Cream*. Bunkie's murder occurs because Bunkie tried to blackmail Lucious into paying him money by threatening to tell the police that Lucious committed other murders long ago. This murder in *Empire* is unrelated to a desire to kill an evil and abusive boyfriend. Additionally, Lucious shoots Bunkie at close range, after speaking to him face to face, whereas Shekwan's attempted murderers remain out of the frame during the shooting. Finally, the urination scene in *Cream* takes place in a parking lot, whereas in *Empire* it occurs on a riverbank underneath a highway overpass. Given all the differences in expression of the urination scenes in *Cream* and *Empire*, Plaintiff's allegation that this scene shows substantial similarity is unconvincing.

As noted, Plaintiff also contends that both works involve flashback scenes, female-female altercations, same-sex relationships, and secret parentage, which show substantial similarity between the two works. These assertions, however, are unavailing.

characters share, including age, sex, and occupation, are too general or too common to deserve copyright protection").

Generally speaking, flashback scenes are not protected. <u>Herzog v. Castle Rock Entm't</u>, 193 F.3d 1241, 1261 (11th Cir. 1999) (noting that flashbacks are familiar devices in film and fiction). They are commonly used devices in a soap opera style story, and have been used countless times in television shows and movies. <u>See</u> <u>id.</u> (citing examples of flashbacks, including *Citizen Kane*, which "uses the device to show how different witnesses remember similar events from Kane's life in opposing ways; and 'the Usual Suspects' where throughout the film the investigation of a suspected drug deal gone bad is portrayed in flashback."). In addition, the flashbacks which appear in the two works here are not similar in expression. *Cream*'s flashbacks are in black-and-white and depict images of Winston's previous sexual encounters, whereas *Empire*'s flashbacks are in color and depict scenes such as Lucious's ALS diagnosis and his rejection of his son Jamal for dressing in women's clothing as a young child. Viewed in the light most favorable to Plaintiff, these flashbacks do not show substantial similarity between *Cream* and *Empire*.

Plaintiff also alleges that *Cream* and *Empire* are substantially similar because both works contain scenes depicting a fight between two women. Such an altercation is a commonly used device in soap operas to drive the narrative. Fights between two female characters (or "female-female altercation") have occurred on famous soap operas such as *Dynasty* and *Melrose Place*.

The scenes in *Cream* and *Empire* depicting these fights are not similar in terms of expression. For example, a female-female altercation in *Cream* occurs when Brenda has a physical fight with Nora, Winston's mother. No similar fight occurs in *Empire*. Additionally, the fight between Tiffany and Chantal in *Cream* is motivated by fear over who spread herpes during a sexual encounter. In contrast, *Empire* contains a scene in which a fight breaks out between Lucious's ex-wife and his current girlfriend (Cookie and Anika) and is motivated by underlying

tensions over Lucious, a mutual love interest.  No similar altercation occurs in *Cream*.  Because the fights in *Cream* and *Empire* involve different types of characters and are motivated by varying conflicts, the female-female altercation appearing in *Empire* is not substantially similar to those shown in *Cream*.

Moving to Plaintiff's allegation that *Cream* and *Empire* are substantially similar because both shows include a same-sex relationship, this argument is unpersausive.  First, the existence of a same-sex relationship, standing alone, is far too general to warrant protection.  Same-sex relationships are commonplace in many soap operas and have been prominent in movies like *Philadelphia*, *The Birdcage*, and *Brokeback Mountain*.  Second, the same-sex relationship in *Cream* is radically different in its expression from the expression shown in *Empire*. *Cream* includes an explicit sex scene between Tiffany and Chantal, two female side characters who are married to men and are having extramarital affairs with Winston.  In *Empire*, one of the main characters—Jamal—is gay.  *Empire* portrays Jamal's sexual orientation as a catalyst of the conflict between Jamal and his father Lucious, and Jamal's same-sex love interest is his boyfriend.  The committed and loving same-sex relationship in *Empire* is nothing like the explicit and fleeting same-sex affair in *Cream*.  Therefore, the mere existence of a same-sex relationship in *Cream* and *Empire* will not support a finding of substantial similarity.

Concluding with Plaintiff's allegation of secret parentage appearing in both works, this assertion does not show substantial similarity between *Cream* and *Empire*.  Revelations about secret parentage are a mainstay of soap opera melodramas, and have been the driving force in movies like *Star Wars*.  This general plot device is not a protectable element of Plaintiff's copyright.

Furthermore, this plot device as used in *Cream* and *Empire* is not similar in expression. In *Cream*, Winston hides the fact that Angelica and Angelo are his children. Instead, Winston and his parents, Nora and Sammy, pretend that Angelica and Angelo are Winston's younger siblings. Nora and Sammy, therefore, raise Angelica and Angelo as their own children. Only in the final episode of *Cream* is it revealed that Angelica and Angelo are Winston's children. Sammy reveals this fact to Angelica in order to secure her shares of Big Balla Records to take control of the company.

In contrast, in *Empire*, Jamal appears to have fathered a child with his ex-wife Olivia, but it is revealed that Lucious is actually the father of Olivia's child. Olivia is a side character who appears with a child named Lola during the sixth episode of *Empire*'s first season. She later vanishes, leaving Lola with the Lyon family. In a later episode, Olivia's current partner Reggie appears at the Lyon family mansion. The audience learns that Reggie is a violent man who has been abusing Olivia. Reggie threatens to shoot and kill Jamal, but Lucious intervenes, confessing that he fathered the child with Olivia. Lucious also confesses that he promised Olivia would be a star if she stayed with Jamal to hide his son's homosexuality. During the tumultuous standoff, Reggie is shot and killed by another character.

Thus, the two depictions of secret parentage are expressed in radically different ways and for different reasons. In *Cream*, Winston's secret parentage is revealed so that Sammy can take control of Big Balla Records. In *Empire*, Lucious's secret parentage is revealed during a nail-biting standoff to save the life of his son Jamal. For these reasons, Plaintiff's comparison of secret parentage appearing in the two works does not support a finding that *Empire* is substantially similar to *Cream*.

In sum, these general plot devices such as flashback scenes, female-female altercations, same-sex relationships, and secret parentage are not protectable elements of Plaintiff's copyright, and cannot be the basis of the infringement claim against Fox Defendants.

**b. Characters**

According to Plaintiff, the characters in the two works are a major point of similarity. (Doc. No. 45 at ¶ 47(D).)  Plaintiff contends Lucious, Cookie, and Andre from *Empire* are substantially similar to Winston, Brenda, and Angelo from *Cream*.  (Id.)  To determine whether characters are similar, courts look at the "totality of [the characters'] attributes and traits as well as the extent to which the defendant's characters capture the total concept and feel of figures in the plaintiff's work."  DiTocco v. Riordan, 815 F. Supp. 2d 655, 667 (S.D.N.Y. 2011); Warner Bros. v. American Broad. Co., 720 F.2d 231, 241 (2d Cir. 1983).  Prototypical or stock characters who display generic traits are "too indistinct to merit copyright protection."  Tanikumi v. Walt Disney Co., 616 F. App'x 515, 519 (3d Cir. 2015); see also Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1259 (11th Cir. 1999) (explaining that "characters who keep secrets are part and parcel of the murder mystery genre and are not protectable"); see also Whitehead v. Paramount Pictures Corp., 53 F. Supp. 2d 38, 50 (D.D.C. 1999) (finding that "general characteristics such as black hair, intelligence, patriotism and slight paranoia . . . are not copyrightable and do not establish substantial similarity").  In fact, the bar for substantial similarity in a character is set high because only characters who are especially distinctive are entitled to protection.  See Hogan v. DC Comics, 48 F. Supp. 2d 298 (S.D.N.Y. 1999) (finding no substantial similarity between two young male half-vampire characters named Nicholas Gaunt who both had similar

appearances, both experienced flashbacks as part of their quest to discover their origins, and both became killers).[7]

First, Plaintiff contends that the two male protagonists, Winston St. James and Lucious Lyon, are substantially similar. (Doc. No. 45 at ¶ 47(D).) Plaintiff characterizes the two men as "African-American male[s] in [their] early to mid-40s who rise[] from poverty and [lives] of crime on the streets of Philadelphia to become the head[s] of a large record label company." (Id.) To be sure, there are similarities between Winston and Lucious. However, these similarities are not copyrightable. The allegation that both characters are African-American men who rise from poverty and lives of crime to become successful is too general to show substantial similarity. See Jackson v. Booker, 465 F. App'x 163, 165 (3d Cir. 2012) (finding no substantial similarity between two characters who "both were African-American males and ex-convicts who become community activists"). The additional description that the two characters run record labels is not distinctive enough to show substantial similarity. See Astor-White v. Strong, No. 15-6326, 2016 WL 1254221, at *5 (C.D. Cal. Mar. 28, 2016) (finding that Lucious Lyon from *Empire* and the plaintiff's character who are both African-American "record moguls who rise to power and become billionaires in the record industry" and who have three children was insufficient to show

---

[7] In another explanation of how two characters are not substantially similar, the court in Rucker v. Harlequin Enterprises, Ltd. wrote:

> The similarities between the characters in Rucker's work and in the Harlequin work are not legally protectable. Both male protagonists are black-haired, blue-eyed, "tall, dark, and handsome" figures. They are wealthy and powerful. The men sweep the female protagonists off their feet, into a luxurious life. The women are beautiful, with red hair and green eyes. They are slender, curvaceous, and young. Their personalities are strong-willed and passionate. These descriptions suffice to make it clear that these are generic characters in romance novels.

No. 12-1135, 2013 WL 707922, at *8 (S.D. Tex. Feb. 26, 2013).

substantial similarity).  The facts that both men have straightened hair or dress in button-down shirts without a tie and occasionally wear a blazer are also too general.  See Newt v. Twentieth Century Fox Film Corp., No. 15-2778, 2016 WL 4059691, at *11 (C.D. Cal. July 27, 2016) (writing that "the alleged 'similarities' in style and dress (e.g., jackets, coats, hats, dresses, hair styles, eyewear, and jewelry) are too common and generic, and constitute *scenes-a-faire* that flow directly from characters in the music industry"); see also Whitehead v. Paramount Pictures Corp., 53 F. Supp. 2d 38, 50 (D.D.C. 1999) (noting that general characteristics such as black hair, and intelligence, among other traits, were not copyrightable and could not establish substantial similarity).  Therefore, the character comparison made between Winston and Lucious is too general to warrant copyright protection.

Furthermore, the overall feel of the two characters is dramatically different.  Winston in *Cream* is best understood as a sexually promiscuous man who contracts herpes, tries to exact revenge on a family member's abusive boyfriend, and lies about the parentage of his children, all while trying to run a record label.  In comparison, Lucious in *Empire* is an ambitious, wealthy, and homophobic entertainment magnate who wants to ensure that his most capable son takes over the family business.  He has a complicated personal and professional relationship with his ex-wife Cookie.  For these reasons, the expression and feel of the two characters is dissimilar, and the comparison drawn between Winston and Lucious does not support a finding of substantial similarity.

Second, Plaintiff makes a comparison between two women, Brenda and Cookie, as "female leads with drug backgrounds who had children with the male protagonist in the past and are now seeking to claim a part of his business."  (Doc. No. 45 at ¶ 47(D).)  Yet the differences between even these characters overshadow their similarities.  Brenda is the ex-girlfriend of

Winston.  She is by all accounts a minor or sideline character in *Cream*, and is not a "lead" as Plaintiff contends.  (See id.)  As a former drug addict, Brenda has no relationship with her children.  In fact, she is only introduced to them at the end of the final episode of *Cream*.  Nowhere in *Cream* is it ever suggested that Brenda has ever owned an interest in Big Balla Records.  In contrast, Cookie Lyon is a leading character in *Empire*.  She is Lucious's ex-wife, and is heavily involved in the lives of her three sons throughout the entire television show.  She is portrayed as a tough and savvy businesswoman who, after her release from prison, is ready to take back control of half of Empire Entertainment.  Notably, she has an extensive background in the music industry, which is demonstrated initially in a flashback scene in which she helps Lucious produce his first hit album and then by managing her son Jamal's music career.  Put simply, there is no similar character to Cookie Lyon who appears in *Cream*.  These two characters, therefore, are not substantially similar.  In fact, they are not similar at all.

Third, Plaintiff asserts that there are substantial similarities between the characters Angelo and Andre.  (Doc. No. 45 at ¶ 47(D).)  The SAC states: "Each of the male leading characters also ha[ve] a son who is suffering from a mental disorder, both of whom exhibit the 'quirk' or symptom of referring to themselves in the third person."  (Id.)  These characters, however, bear even less resemblance to each other than the other comparisons drawn by Plaintiff.  Angelo appears in only two scenes of the *Cream* series.  He seems to suffer from a significant developmental disability or mental delay.  Other characters refer to Angelo as a "special needs" person and attribute his disability to his mother's drug use during pregnancy.  In stark contrast to Angelo's limitations, Andre in *Empire* is a highly educated and functioning individual.  He is a Wharton graduate who has continuously helped his father with the finances of a hugely successful record label and entertainment company.  Although he suffers from bipolar disorder,

this illness has not affected his cognitive abilities. His manic episodes arising from his bipolar disorder are shown in a few scenes, but they are vastly different from Angelo's overall inability to function independently as portrayed in *Cream*.

Plaintiff's allegation that Angelo and Andre have the "quirk" of referring to themselves in the third person overstates the importance of this characteristic, and does not show an appreciable similarity. (<u>Id.</u>) One of the only times Angelo speaks is in the second episode of *Cream* when he is first introduced to the audience. He cannot speak full sentences and repeatedly says "Angelo in the house." In contrast, Andre has no problem speaking to others and presenting important matters at board meetings for Empire Entertainment. He regularly refers to himself in the first person, and only refers to himself in the third person during a manic episode. During this episode, he switches back and forth using the first and third person. These two scenes alone do not show that Angelo and Andre are substantially similar.

Most tellingly, there are characters with no counterparts featured in *Cream* and *Empire*. What is notably lacking in *Cream* is the triad of brothers who fight to succeed their father for control over the family record label. *Cream* has no counterpart to Andre, Jamal, and Hakeem who are main characters in *Empire*. These characters do not appear in *Cream*, and without them, there is no substantial similarity.

Given the above discussion demonstrating that the characters of *Cream* are not substantially similar to those featured in *Empire*, this component of the analysis does not plausibly support a conclusion that the works are substantially similar.

### c. Theme

Next, Plaintiff contends that the themes of *Cream* and *Empire* are substantially similar. (Doc. No. 45 at ¶ 47(A).)  Specifically, Plaintiff asserts that both *Cream* and *Empire* are soap opera dramas which "focus on an African-American male who has overcome a disadvantaged/criminal past to achieve financial success in the music industry only to be exploited by those closest to him."  (Id.)  However, this general theme is not copyrightable.  See Winstead v. Jackson, 509 F. App'x 139, 144 (3d Cir. 2013) (explaining that two works that explored the same theme about life on "the streets" necessarily contained similar elements of "the story of an angry and wronged protagonist who turns to a life of violence and crime" and that "this story has long been part of the public domain."); see also DiTocco v. Riordan, 815 F. Supp. 2d 655, 670 (S.D.N.Y. 2011), aff'd 496 F. App'x 126 (2d Cir. 2012) (finding that stock themes such as "the development of an adolescent man through a series of tests," bravery, independence and "mythology affect[ing] the real world" were not protectable).

The idea of an African-American male who rises up from a disadvantaged or criminal past to achieve success through music is nothing new to storytelling, nor is it a protectable element of Plaintiff's work.  It is a compelling theme which has played out both in real life and which has been prominent in many forms of artistic expression.  Hip-hop moguls such as Jay-z, Dr. Dre, and Sean ("Diddy") Combs are living examples of this remarkable story.  Rappers like Tupac Shakur, Snoop Dogg, Master P, and Kanye West have written prolific rhymes about this very idea.  Movies such as *Hustle & Flow* and *Get Rich or Die Tryin'* depict hip-hop artists struggling to break out.  Biographical movies (or biopics) including *Straight Outta Compton* and *Notorious* dramatize the lives and careers of famous rappers, who achieve overwhelming success in the music industry despite overcoming staggering obstacles.  Moreover, documentaries like

*Tupac: Resurrection*, *The Carter*, and *Beats, Rhymes & Life: The Travels of a Tribe Called Quest* also delve into this theme of hip-hop as the product of struggle and the vehicle for achieving success. Watching people overcome long odds and achieve success thanks to their creative gifts has strong narrative impact. Watching those same people achieve success through their musical talents and start a record label is compelling, though not distinctive. Therefore, similarities alleged between the themes of *Cream* and *Empire* are not a protectable element of a copyright.

### d. Mood

Next, Plaintiff asserts that the moods expressed in *Cream* and *Empire* are substantially similar because both contain "regular musical interludes." (Doc. No. 45 at ¶ 47(E).) This contention, however, does not support a claim of copyright infringement. Musical interludes are nothing new to film. Televisions shows dating back to *The Partridge Family* have used musical numbers to bridge one scene to the next. Such devices can be found in popular contemporary television shows such as *Glee* and *Nashville*. In addition, the expression of musical interludes in each work is strikingly different. The musical interludes in *Cream* are performed by minor or nameless characters, and are used for comedic or entertainment purposes; whereas the musical interludes in *Empire* are often performed by central characters. Through these musical numbers, the audience learns more about the nuances of the character's desires. Because musical interludes themselves are commonly used devices, and the expression of these devices varies dramatically in the two works at issue here, Plaintiff's assertion that musical interludes show substantial similarity is not persuasive.

### e. Setting

Plaintiff contends that the settings of *Cream* and *Empire* support a finding that the two works are substantially similar. (Doc. No. 45 at ¶ 47(C).) Facts pled in a complaint

demonstrating substantial similarity in the settings of the copyrighted work and the allegedly infringing work may support a finding that a plaintiff has stated a claim for copyright infringement.  <u>Tanikumi v. Walt Disney Co.</u>, 616 F. App'x 515, 521 (3d Cir. 2015).  Plaintiff contends that "both 'Cream' and 'Empire' are based out of or derive its [sic] origin from, counterintuitively, Philadelphia, which is certainly not known as a hot spot in the recording industry."  (Doc. No. 45 at ¶ 47(C).)  Despite Plaintiff's contention, *Empire* is set in New York City, whereas *Cream* is based entirely in Philadelphia.  Although Lucious and Cookie Lyon are originally from Philadelphia, representations of the city play out only in flashbacks showing their criminal past, and in a few scenes where Cookie re-visits the city after her release from prison.  Philadelphia is not the setting of *Empire*.  Thus, Plaintiff's contention that the two works share the same setting cannot be the basis for a claim of copyright infringement.

### f.  Dialogue

Last, Fox Defendants argue that Plaintiff cannot point to any similar dialogue between *Cream* and *Empire* to show substantial similarity.  (Doc. No. 54 at 34.)  Similar dialogue appearing in two works is commonly used to support a claim of copyright infringement.  <u>See, e.g.</u>, <u>Jackson v. Booker</u>, 465 F. App'x 163, 168 (3d Cir. 2012) (considering lack of similar dialogue in support of its finding of no substantial similarity between the copyrighted work and the allegedly infringing work).  Lack of any similar dialogue in *Cream* and *Empire*, therefore, weighs in favor of the conclusion that it is not plausible that the two works are substantially similar.

In conclusion, in viewing the comparisons in the light most favorable to Plaintiff, it is evident that *Cream* and *Empire* contain dramatically different expressions of plot, characters, theme, mood, setting, dialogue, total concept, and overall feel.  Consequently, this Court finds

that *Empire* is not substantially similar to *Cream*. Plaintiff has not stated a claim for copyright infringement against Fox Defendants. Therefore, this claim, as asserted in Count I, will be dismissed.

### B. Plaintiff Has Not Plausibly Alleged a Claim of Contributory Copyright Infringement Against Sharon Pinkenson and the Greater Philadelphia Film Office

Next, Plaintiff contends that Sharon Pinkenson and the Greater Philadelphia Film Office ("GPFO") committed contributory copyright infringement stemming from their organization of Philly Pitch, where Plaintiff met Lee Daniels. (Doc. No. 45 at ¶¶ 57-64.) A party "who, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another, may be held liable as a 'contributory infringer.'" Columbia Pictures Indus., Inc. v. Redd Horne, Inc., 749 F.2d 154, 160 (3d Cir. 1984) (quoting Gershwin Publishing Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1162 (2d Cir. 1971)). To establish a claim of contributory infringement, a plaintiff must show: "(1) a third party directly infringed the plaintiff's copyright; (2) the defendant knew that the third party was directly infringing; and (3) the defendant materially contributed to or induced the infringement." Leonard v. Stemtech Int'l Inc., 834 F.3d 376, 387 (3d Cir. 2016).

Pinkenson and GPFO argue that Plaintiff's claim fails to satisfy all three elements of a contributory copyright infringement claim. (Doc. No. 53 at 12-15.) For reasons that follow, the Court agrees.

Considering the first element of a contributory copyright infringement claim, Pinkenson and GPFO argue that the contributory copyright infringement claim fails because Plaintiff has not pled plausible facts showing that a third party directly infringed on his copyrighted work. (Doc. No. 53 at 12.) In order to claim that a defendant is a contributory infringer, the plaintiff

"must allege first, that he had registered copyrights that were infringed by a third party." <u>Parker v. Google, Inc.</u>, 422 F. Supp. 2d 492, 499 (E.D. Pa. 2006), <u>aff'd</u>, 242 F. App'x 833, 837 (3d Cir. 2007). A claim of contributory infringement "cannot stand without plausible allegations of third-party direct infringement." <u>Parker v. Yahoo!, Inc.</u>, No. 07-2757, 2008 WL 4410095, at *5 (E.D. Pa. Sept. 25, 2008) (citing <u>Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.</u>, 545 U.S. 913, 930 (2005)). Because Plaintiff has failed to plead plausible facts showing that Fox Defendants directly infringed on his copyright of *Cream*, he cannot state a claim for contributory copyright infringement against Pinkenson and GPFO. For this reason alone, the contributory copyright infringement claim can be dismissed.

With respect to the second element of a contributory infringement claim, Pinkenson and GPFO argue that Plaintiff has not plausibly alleged facts showing that they had any knowledge of Fox Defendants' alleged direct infringement of *Cream*. (Doc. No. 53 at 14.) A plaintiff must allege facts showing that the defendant had knowledge of the third-party infringement. <u>Leonard</u>, 834 F.3d at 387. This knowledge requirement has been interpreted to include "both those with actual knowledge and those who have reason to know of direct infringement."[8] <u>Parker v. Google</u>, 422 F. Supp. 2d at 499.

---

[8] Defendants argue that the knowledge element of a contributory infringement cause of action requires actual knowledge, and that constructive knowledge is insufficient. Although Defendants are correct that the Third Circuit has never expressly held that anything short of actual knowledge is sufficient to state a claim for contributory copyright infringement, district courts within the Third Circuit have held that constructive knowledge is sufficient. <u>See</u> <u>Parker v. Google</u>, 422 F. Supp. 2d 492, 499 (E.D. Pa. 2006), <u>aff'd</u>, 242 F. App'x 833 (3d Cir. 2007) (the knowledge element includes "both those with actual knowledge and those who have reason to know of direct infringement"); <u>see also</u> <u>Gordon v. Pearson Educ., Inc.</u>, 85 F. Supp. 3d 813, 818 (E.D. Pa. 2015) (citation omitted) ("The knowledge requirement has been interpreted to include both those with actual knowledge and those who have reason to know of direct infringement."). Therefore, this Court will analyze the knowledge requirement as including both actual and constructive knowledge.

The SAC alleges that Pinkenson and GPFO "provided a venue" by hosting Philly Pitch, where Plaintiff met Daniels and discussed *Cream*. (Doc. No. 45 at ¶ 60.) It also asserts that Pinkenson and GPFO required each contestant to sign a release attesting that he was presenting an "authentic and genuine" work, but that the release was lacking because it "did not . . . protect those works from unauthorized use by the judges." (Doc. No. 45 at ¶ 33.)

These allegations, taken together, fail to show that Pinkenson or GPFO knew or had reason to know that Daniels or the other Fox Defendants allegedly would infringe on Plaintiff's copyright. The SAC is devoid of any facts which would raise an inference that Pinkenson or GPFO knew or would reasonably know that Daniels was or would later allegedly infringe on the *Cream* copyright. "Whether or not Pinkenson and GPFO knew Plaintiff spoke with Daniels at the event or gave Daniels the 'Cream Materials' is of no consequence because the pleading standard requires Plaintiff allege the Philadelphia Defendants' knowledge of the purported infringement." (Doc. No. 53 at 14.) In addition, the SAC's allegations regarding the releases, which guaranteed that each contestant's work was authentic, lends no support to Plaintiff's claims about Pinkenson or GPFOs' knowledge, either actual or constructive, of alleged third-party infringement.

Turning to the third element of a contributory infringement claim, Pinkenson and GPFO argue that Plaintiff has not plausibly alleged facts showing that they materially contributed to or induced the infringement. (Id. at 15.) A plaintiff must allege facts demonstrating the defendant's material contribution to or inducement of the third-party infringement. Leonard, 834 F.3d at 387. Material contribution or inducement is "personal conduct that encourages or assists the infringement." Gordon v. Pearson Educ., Inc., 85 F. Supp. 3d 813, 819 (E.D. Pa. 2015). The encouragement or assistance "must bear some direct relationship to the infringing acts, and the

person rendering such assistance or giving such authorization must be acting in concert with the infringer." 3 <u>Nimmer on Copyright</u> § 12.04[A][3][a] (citing <u>Parker v. Google</u>, 422 F. Supp. 2d at 499); <u>see also</u> <u>Perfect 10, Inc. v. Amazon.com, Inc.</u>, 508 F.3d 1146, 1171 (9th Cir. 2007) (explaining that "an actor may be contributorily liable . . . if the actor knowingly takes steps that are substantially certain to result in such direct infringement.").

For example, in <u>Live Face on Web, LLC v. Control Group Media Co.</u>, a plaintiff which copyrighted "live face on web" packages that were used in conjunction with its proprietary software sued a licensee of its software for contributory copyright infringement. 150 F. Supp. 3d 489 (E.D. Pa. 2015). The plaintiff alleged that the licensee should be liable for contributory infringement because it provided the means for visitors to the licensee's website to download an unauthorized version of the plaintiff's copyrighted package. <u>Id.</u> However, the court found that the complaint failed to plead plausible facts showing material contribution. <u>Id.</u> at 499. It explained that "simple downloading of the [plaintiff's packages] onto a computer's RAM is not enough for contributory infringement." <u>Id.</u> This, the court explained, was similar to the "mere operation of a website business" and did not demonstrate encouragement or assistance to third-party infringement. <u>Id.</u>

Like <u>Live Face on Web, LLC.</u>, the SAC here is devoid of plausible facts showing material contribution. Rather, the SAC alleges only that Pinkenson and GPFO provided a forum where Plaintiff met Daniels. This is not sufficient to show material contribution or inducement. <u>See</u> <u>Gordon</u>, 85 F. Supp. 3d at 822 ("[M]erely supplying the means to accomplish infringing activity is not enough."); <u>see also</u> <u>Wolk v. Khodak Imaging Network, Inc.</u>, 840 F. Supp. 2d 724, 750 (S.D.N.Y. 2012) (citation omitted) ("An allegation that a defendant merely provid[ed] the means to accomplish an infringing activity is insufficient to establish a claim for contributory

copyright infringement.").  Organizing an event where Plaintiff meets a third party, who several years later may have directly infringed on Plaintiff's work, is not the type of affirmative conduct which gives rise to liability as a contributory infringer.  Because the SAC does not plausibly allege direct infringement by Fox Defendants, or that Pinkenson or GPFO reasonably should have known of alleged infringing conduct, or materially contributed to or induced infringement of the *Cream* copyright, this claim fails.  In sum, Plaintiff's contributory copyright infringement claim against Pinkenson and GPFO will be dismissed.

### C.  Plaintiff Has Not Plausibly Alleged a Claim of Negligence Against Sharon Pinkenson and the Greater Philadelphia Film Office

In Count III of the SAC, Plaintiff alleges a negligence claim against Pinkenson and GPFO in connection with Philly Pitch.  (Doc. No. 45 at ¶¶ 65-70.)  Specifically, Plaintiff alleges that Defendants "negligently failed to disclaim liability or otherwise warn participants of the dangers of unauthorized copying, and negligently failed to obtain appropriate guarantees and undertakings from the judges in order to protect the original work presented from any kind of misappropriation."  (Id. at ¶ 69.)  Defendants argue to the contrary that the state law negligence claim is preempted by the Copyright Act.  (Doc. No. 53 at 18-21.)  In addition, Defendants assert that Plaintiff has failed to plausibly allege facts showing negligence.  (Id. at 21-22.)

### 1.  Plaintiff's Negligence Claim is Preempted by the Copyright Act

Pinkenson and GPFO argue that Plaintiff's negligence claim is preempted by the Copyright Act.  (Id. at 18-21.)  The Copyright Act expressly preempts all causes of action falling within its scope, with few exceptions.  Dun v. Bradstreet Software Servs., Inc. v. Grace Consulting, Inc., 307 F.3d 197, 216-17 (3d Cir. 2002).  Section 301(a) of the Copyright Act provides as follows:

On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a). This preemption provision "accomplishes the general federal policy of creating a uniform method for protecting and enforcing certain rights in intellectual property by preempting other claims." Daboub v. Gibbons, 42 F.3d 285, 288 (5th Cir. 1995).

Courts have interpreted Section 301(a) to contain a two-step test. Id. Under this test, a state law claim will be preempted when "(1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act under 17 U.S.C. §§ 102 and 103,[9] and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of

---

[9] Section 102 of the Copyright Act provides:

(a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

(1) literary works;

(2) musical works, including any accompanying words;

(3) dramatic works, including any accompanying music;

(4) pantomimes and choreographic works;

(5) pictorial, graphic, and sculptural works;

(6) motion pictures and other audiovisual works;

(7) sound recordings; and

the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106."[10]

Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 305 (2d Cir. 2004). The first prong

---

    (8) architectural works.

    (b) In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

17 U.S.C. § 102. In addition, Section 103 of the Copyright Act states:

    (a) The subject matter of copyright as specified by section 102 includes compilations and derivative works, but protection for a work employing preexisting material in which copyright subsists does not extend to any part of the work in which such material has been used unlawfully.

    (b) The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. The copyright in such work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material.

 17 U.S.C. § 103.

[10] Section 106 of the Copyright Act provides:

    Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

        (1) to reproduce the copyrighted work in copies or phonorecords;

        (2) to prepare derivative works based upon the copyrighted work;

        (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

        (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

of this test is called the "subject matter requirement," and indicates the subject matter of the state law claim must fall within the subject matter of the Copyright Act. <u>Id.</u> The second prong is referred to as the "general scope requirement," and focuses on whether the state law claim "include[s] any extra elements that made it qualitatively different from a copyright infringement claim." <u>Id.</u> Courts within the Third Circuit "take a restrictive view of what extra elements transform an otherwise equivalent claim into one that is qualitatively different from a copyright infringement claim." <u>See, e.g.</u>, <u>Tegg Corp. v. Beckstrom Elec. Co.</u>, 650 F. Supp. 2d 413, 422 (W.D. Pa. 2008) (holding that civil conspiracy, tortious interference, and conversion claims were preempted by the Copyright Act).

Here, Plaintiff alleges a state law negligence claim and a contributory copyright infringement claim against Sharon Pinkenson and GPFO. (Doc. No. 45 at ¶¶ 65-70.) Under the two-step test, it is clear that the first element or the subject matter requirement is satisfied. *Cream*, the work allegedly infringed, falls within the scope of copyright protection. <u>See</u> 17 U.S.C. § 102. The second element, the general scope requirement, however, is contested.

As noted, this second requirement focuses on whether the state law claim includes an extra element that makes it qualitatively different form the copyright infringement claims. <u>Briarpatch Ltd., L.P.</u>, 373 F.3d at 305. Courts have held that state law negligence claims lack the "extra element" to avoid preemption. <u>Parker v. Yahoo!, Inc.</u>, 2008 WL 4410095, at *6 (E.D. Pa.

---

        (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

        (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C. § 106.

Sept. 25, 2008). A negligence claim under Pennsylvania law contains four elements: (1) a duty or obligation recognized by the law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting in harm to the plaintiff. Farabaugh v. Pennsylvania Turnpike Comm'n, 911 A.2d 1264, 1272-73 (Pa. 2006).

Here, Plaintiff's contributory copyright infringement claim alleges:

> 59. Plaintiff believes, and therefore, avers that Pinkenson and GPFO failed to institute proper safeguards and otherwise take appropriate measures [to] properly or adequately ensure that the original creations pitched by participants during GPFO's Philly Pitch Event in April 2008 would be protected from unauthorized copying or other misuse. In particular, but without limitation by specification, Pinkenson and GPFO failed to disclaim liability or otherwise warn participants of the dangers of authorized copying, and failed to obtain appropriate guarantees and undertakings from the judges in order to protect the original work presented from misappropriation.

> 60. Furthermore, Plaintiff believes and, therefore, avers that Pinkenson and GPFO have contributorily infringed upon [Plaintiff's] copyright by materially facilitating the direct infringement committed by the Fox Defendants insofar as they provided the venue that led [Plaintiff] to Daniels and created an environment where [Plaintiff] was induced and encouraged to share the Cream materials with Daniels, and Daniels was thereby afforded an opportunity to obtain the Cream materials.

(Doc. No. 45 at ¶¶ 59, 60.) Plaintiff's contributory copyright infringement claim against Pinkenson and GPFO alleges that these Defendants "failed to institute proper safeguards and otherwise take appropriate measures to properly or adequately ensure that the original creations pitched by participants during GPFO's Philly Pitch Event in April 2008 would be protected from unauthorized copying or other misuse." (Id. at ¶ 59.) Similarly, Plaintiff's negligence claim alleges that Pinkenson and "had a duty to [Plaintiff] to take appropriate measures in order to safeguard his legitimate interests in the original works presented at the 2008 Philly Pitch Event, and to protect those works from misappropriation or misuse." (Id. at ¶ 66.)

Both the copyright claim and negligence claim allege that Pinkenson and GPFO should have, but did not, implement "appropriate measures" to "protect [Plaintiff's] original work . . . from any kind of misappropriation." (Id. at ¶¶ 59, 68-69.) The same allegations are used by Plaintiff to support both claims. The gist of Plaintiff's allegations in both claims is that Pinkenson and GPFO failed to protect Plaintiff's copyrighted work from misappropriation by the judges at Philly Pitch and therefore contributed to the alleged infringement. "The grounds for the negligence claim are virtually the same as those for the contributory copyright infringement claim." (Doc. No. 53 at 20.) Moreover, both claims seek the same relief—"monetary damages in the form of lost profits and copyright infringement." (Doc. No. 45 at ¶¶ 63, 70.) In conclusion, Plaintiff's negligence claim against Pinkenson and GPFO covers the same subject matter as that governed by the Copyright Act and lacks any extra element to avoid preemption. Therefore, this claim will be dismissed.

### 2. Plaintiff Has Not Plausibly Alleged a Claim of Negligence

Next, Pinkenson and GPFO argue that Plaintiff has not plausibly alleged a claim of negligence in the SAC. (Doc. No. 53 at 21-22.) As discussed, under Pennsylvania law, the elements of negligence are: (1) a duty or obligation recognized by the law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting in harm to the plaintiff. Farabaugh v. Pennsylvania Turnpike Comm'n, 911 A.2d 1264, 1272-73 (Pa. 2006).

Here, Plaintiff contends that "Pinkenson and GPFO had a duty to [Plaintiff] to take appropriate measures in order to safeguard his legitimate interests in the original works presented at the 2008 Philly Pitch event, and to protect those works from misappropriation or misuse." (Doc. No. 45 at ¶ 66.) Plaintiff asserts that this duty arises from Pinkenson and GPFOs' "actions

in establishing conditions (and encouraging participation)" in the event. (Doc. No. 57 at 30.) He also contends that this duty arises from the releases which guaranteed that each contestant's work was authentic and genuine, and that Pinkenson and GPFO should have "protect[ed] those works from unauthorized use by judges or anyone else." (Doc. No. 45 at ¶ 33.) This argument, however, is unavailing. Plaintiff identifies no source of the alleged duty to prepare releases or protect his copyright from infringement by third parties. (See Doc. No. 53 at 22.) "Even if Plaintiff could identify such a duty, whatever duty Pinkenson and GPFO owed Plaintiff was no greater than Plaintiff's own duty to police his own copyright." (Id.) Additionally, this non-existent duty would not have extended to *Cream*, which was not pitched to the panel of judges, but rather was only discussed privately between Plaintiff and Daniels. (See Doc. No. 53, Ex. B.) Because Plaintiff has failed to plausibly allege that Pinkenson and GPFO owed him a duty to protect his copyright, this negligence claim will be dismissed.

**D.** **Plaintiff Has Not Plausibly Alleged a Claim of Intentional Misrepresentation Against Lee Daniels**

In Count IV of the SAC, Plaintiff asserts an intentional misrepresentation claim against Lee Daniels. (Doc. No. 45 at ¶¶ 71-75.) In defending against this claim, Daniels argues that Plaintiff has failed to plausibly allege facts showing intentional misrepresentation. (Doc. No. 54 at 43-45.) Daniels also submits that this state law claim is preempted by the Copyright Act.[11] (Id. at 42.)

_____

[11] Daniels argues that Plaintiff's state law claims of intentional and negligent misrepresentation must be dismissed because they are preempted by the Copyright Act. (Doc. No. 54 at 42.) As previously noted, the Copyright Act expressly preempts all causes of action falling within its scope, with few exceptions. Dun v. Bradstreet Software Servs., Inc. v. Grace Consulting, Inc., 307 F.3d 197, 216-17 (3d Cir. 2002). A claim will be preempted by Section 301 of the Copyright Act when (1) the subject matter of the claims falls within the subject matter of the Copyright Act, and (2) the asserted state law right is equivalent to those rights granted in Section 106 of the Copyright Act. Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296,

305 (2d Cir. 2004).  The second part of this two-step test focuses on whether the state law claim "include[s] any extra elements that make it qualitatively different from a copyright infringement claim."  Id.

In this case, Plaintiff raises a copyright infringement claim, a state law intentional misrepresentation claim, and a state law negligent misrepresentation claim against Daniels. (Doc. No. 45 at ¶¶ 42-56, 71-75.)  Under the two-step test, the subject matter requirement is satisfied because Plaintiff alleges in all three causes of action that *Cream*, his copyrighted work, was infringed upon.  However, the general scope requirement is contested.

As noted, the general scope requirement focuses on whether the state law claim includes an extra element that makes it qualitatively different from the copyright infringement claim.  Briarpatch Ltd., L.P., 373 F.3d at 305.   Under Pennsylvania law, to establish intentional misrepresentation, a plaintiff must show:

> (1) A representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

Hanover Insurance Co. v. Ryan, 619 F. Supp. 2d 127, 141 (E.D. Pa. 2007) (quoting Heritage Surveyors & Engineers, Inc. v. National Penn Bank, 801 A.2d 1248, 1250-51 (Pa. 2002)).

Additionally, in Pennsylvania, the elements of a state law negligent misrepresentation claim are:

> (1) a misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity, or must make the representation under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation.

Weisblatt v. Minnesota Mut. Life Ins. Co., 4 F. Supp. 2d 371, 377 (E.D. Pa. 1998) (citing Gibbs v. Ernst, 647 A.2d 882, 890 (Pa. 1994)).

Generally speaking, "fraud or negligent misrepresentation claims are generally not preempted because they involve the element of a statement or misrepresentation that induced the plaintiff's reliance and caused damages not attributable to copyright infringement."  Zito v. Steeplechase Films, Inc., 267 F. Supp. 2d 1022, 1027 (N.D. Cal. 2003).  However, a fraud or intentional misrepresentation claim can be "disguised as a copyright infringement claim" if the sole basis of the fraud claim is that a defendant represented materials as his own.  Seng-Tiong Ho v. Taflove, 648 F.3d 489, 502-03 (7th Cir. 2011) (citing 1 Nimmer & Nimmer § 1.01[B][1][e]).  Here, Plaintiff alleges that the statement Daniels made to him at Philly Pitch

Daniels argues that Plaintiff has not stated a claim for intentional misrepresentation. (Doc. No. 54 at 43-45.) In Pennsylvania, the elements of an intentional misrepresentation claim are:

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or with recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) injury resulting [from] and proximately caused by the reliance.

Yakubov v. GEICO Gen. Ins. Co., No. 11-3082, 2011 WL 5075080, at *2 (E.D. Pa. Oct. 24, 2011) (quoting Bortz v. Noon, 729 A.2d 555, 560 (Pa. 1999)). These elements are equivalent to those of fraud. Square D Co. v. Scott Elec. Co., No. 06-0459, 2008 WL 2096890, at *2 (W.D. Pa. May 16, 2008). Therefore, the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) apply.[12] Id.

Daniels argues that Plaintiff's intentional misrepresentation claim fails because the SAC does not allege a misrepresentation of a past or present material fact. (Id.) "Although it is well-established that fraud consists of anything calculated to deceive, whether by single act or

---

was a misrepresentation. This extra element of a misrepresentation in both the intentional misrepresentation and negligent misrepresentation claims is absent from the copyright infringement claim. In addition, Plaintiff requests relief for "pain and humiliation" in these tort claims. This relief is not recoverable under the Copyright Act, which provides recovery for lost profits, injunctive relief, and attorney's fees. Therefore, these tort claims are not preempted by the Copyright Act. But this holding is not dispositive of Plaintiff's intentional and negligent misrepresentation claims because of the failure to assert an actual misrepresentation.

[12] Federal Rule of Civil Procedure 9(b) provides:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

Fed. R. Civ. P. 9(b).

combination . . . , it is equally clear that a promise to do something in the future and the failure to keep that promise, is *not* fraud." Greenberg v. Tomlin, 816 F. Supp. 1039, 1054 (E.D. Pa. 1993). Rather, stating a claim for fraud or intentional misrepresentation "requires that a misrepresentation of a past or present material fact be pleaded and proved." Id. (citations omitted). Although a statement of present intention which is false when uttered may constitute a misrepresentation of material fact, "non-performance does not by itself prove a lack of present intent." See Mellon Bank Corp. v. First Union Real Estate Equity and Mortg. Invs., 951 F.2d 1399, 1410-11 (3d Cir. 1991) (holding that First Union's repudiation of its promise not to prepay mortgages held by Mellon Bank was not evidence of fraud in the absence of evidence that First Union's original intent was not be abide by the original agreement).

For example, in KDH Electronic Systems, Inc. v. Curtis Tech., Ltd., which involved a contract dispute over development of a sonar system, the plaintiffs raised counterclaims alleging in part that the defendants should be liable under a theory of fraudulent misrepresentation for overstating market sales projections during contract negotiations. 826 F. Supp. 2d 782, 802-03 (E.D. Pa. 2010). The court, however, found that the defendants "merely provided predictions of future sales" and that the plaintiffs "had not alleged that [defendants] did not intend to meet those goals." Id. at 803. Such projections were not promises, nor were the projections misrepresentations of past or present material facts, and thus the fraudulent misrepresentation claim was dismissed.[13]

---

[13] Pennsylvania's courts have reached similar conclusions. See Krause v. Great Lakes Holdings, Inc., 563 A.2d 1882, 1188 (Pa. 1989) (finding that the defendant's alleged oral representation that it would assume an obligation for another company's debt in return for a three-year moratorium on payments and the plaintiffs' forbearance from immediate legal action constituted a promise to do something in the future and was not a proper basis for a fraud action); see also Boyd v. Rockwood Area Sch. Dist., 907 A.2d 1157, 1170 (Pa. Commw. Ct. 2006) (holding that the alleged representation of a teachers' union president to employees of a

Here, the SAC alleges "Daniels . . . affirmatively represented to [Plaintiff] that he was very interested in [*Cream*] and might well be disposed to proceed further with its development as a television soap opera series."  (Doc. No. 45 at ¶ 72.)  Daniels suggested that he <u>might</u> be interested in developing Plaintiff's work.  (Doc. No. 45 at ¶ 72.)  Daniel's statement is not a representation of a past fact.  Moreover, the statement is not a misrepresentation of present fact because he did not guarantee at that point that *Cream* would be developed in the future.  Most significantly, Daniels did not make any promise to Plaintiff.  Simply because Daniels later changed his mind and lost interest in developing *Cream* does not mean that his statement was a misrepresentation of a past or present material fact.  <u>See</u> <u>Mellon Bank Corp.</u>, 951 F.2d at 1411 ("Statements of intention made at the time of contracting are not fraudulent simply because of a later change of mind.").

Like the defendant's statement in <u>KDH Electronic Systems, Inc.</u>, Daniel's statement that he "might well be disposed to proceed" in *Cream*'s development is not a misrepresentation of past or present material fact.  Neither this statement nor anything else in the SAC alleges plausible facts showing a misrepresentation of a past or present material fact.  <u>See</u> <u>Krause v. Great Lakes Holdings, Inc.</u>, 563 A.2d 1182, 1187 (Pa. 1989).  For this reason, Plaintiff's intentional misrepresentation claim against Daniels cannot be maintained.

---

school district who were considering early retirement that the school district would continue to provide the same health insurance coverage provided in the then-existing collective bargaining agreement until the employees reached the Medicare eligibility did not amount to a misrepresentation.  It did not constitute fraud, especially since there was no evidence that the union president actually knew, or should have known, that there would be a change of health insurance coverage in the next collective bargaining agreement).

### E. Plaintiff Has Not Plausibly Alleged a Claim of Negligent Misrepresentation Against Lee Daniels

In Count V of the SAC, Plaintiff raises a negligent misrepresentation claim against Lee Daniels. (Doc. No. 45 at ¶¶ 71-75.) Daniels argues that Plaintiff has failed to plausibly allege facts showing negligent misrepresentation. (Doc. No. 54 at 43-45.) Moreover, Daniels asserts that the Copyright Act preempts this state law claim. (<u>Id.</u> at 42.)

Daniels argues that Plaintiff has not plausibly alleged a claim of negligent misrepresentation. (<u>Id.</u> at 43-45.) Under Pennsylvania law, the elements of negligent misrepresentation are:

> (1) a misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity or must make the representation under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation.

<u>Azarchi-Steinhauser v. Protective Life Ins. Co.</u>, 629 F. Supp. 2d 495, 501 (E.D. Pa. 2009) (quoting <u>Gibbs v. Ernst</u>, 647 A.2d 882, 890 (Pa. 1994)). Further, "[a] negligent misrepresentation claim must be based on some duty owed by one party to another." <u>Abdul-Rahman v. Chase Home Fin. Co.</u>, No. 13-5320, 2014 WL 3408564, at *5 (E.D. Pa. July 11, 2014) (citing <u>Gibbs</u>, 647 A.2d at 890).

Here, Plaintiff's allegations fail to state a claim for negligent misrepresentation for two reasons. First, the SAC fails to allege Daniels owed a duty to Plaintiff. Second, the SAC fails to plead facts demonstrating that Daniels made a misrepresentation of past or present material fact.

As previously discussed under the negligence claim, no duty on the part of Pinkenson or GPFO arose from their organization of Philly Pitch. The same applies here to Plaintiff's negligent misrepresentation claim against Daniels, one of the judges at the event. Nothing in the

SAC demonstrates that Daniels owed a duty to Plaintiff. The SAC alleges that Plaintiff met Daniels at Philly Pitch and that they had a "private conversation" during which they discussed *Cream*. (Doc. No. 45 at ¶¶ 34-35.) This conversation, taken alone, does not establish a duty Daniels owed to Plaintiff in the absence of any additional circumstances from which a duty could be inferred. See Bucci v. Wachovia Bank, N.A., 591 F. Supp. 2d 773, 783 (E.D. Pa. 2008) (no duty where the plaintiff failed to allege anything but an arms-length transaction with the defendant); see also Schnell v. Bank of New York Mellon, 828 F. Supp. 2d 798, 806 (finding that a mortgage lender acting in its financial interest did not owe a duty to a borrower). Since the SAC fails to allege a duty owed by Daniels to Plaintiff, this negligent misrepresentation claim must be dismissed.

In addition, as noted in the discussion of Plaintiff's intentional misrepresentation claim against Daniels, the SAC does not allege a misrepresentation of past or present material fact. Such a misrepresentation also is essential to state a claim of negligent misrepresentation. See Azarchi-Steinhauser, 629 F. Supp. 2d at 501 (listing "a material misrepresentation of material fact" as an element required to state a negligent misrepresentation claim). Rather, the SAC alleges that Daniels "affirmatively represented to [Plaintiff] that he was very interested in [*Cream*] and might well be disposed to proceed further with its development as a television soap opera series." (Doc. No. 45 at ¶ 72.) Under Pennsylvania law, however, promises to perform future acts are not misrepresentations unless the promise maker did not intend to fulfill the promise. Mellon Bank Corp., 951 F.2d at 1409-10. Daniels did not promise to Plaintiff to perform a future act. Daniels only suggested that he might be interested in developing Plaintiff's work. (Doc. No. 45 at ¶ 72.) He did not guarantee that development would happen. Nothing in

the SAC, therefore, alleges plausible facts showing a misrepresentation of past or present material fact.

Ultimately, the SAC offers nothing more than conclusory allegations and restatements of law, all of which are insufficient to plausibly state a claim of negligent misrepresentation. Because the SAC fails to allege facts showing that Daniels owed a duty to Plaintiff or that Daniels made a misrepresentation of past or present material fact, the negligent misrepresentation claim cannot be maintained.

### F. Plaintiff Has Not Plausibly Alleged a Claim of Contributory Copyright Infringement Against Leah Daniels-Butler

Plaintiff's final claim is that Leah Daniels-Butler committed contributory copyright infringement by assisting her brother, Lee Daniels, in the production of *Empire*. (Doc. No. 45 at ¶¶ 79-86). As noted, to state a claim for contributory copyright infringement, a plaintiff must plead facts showing: "(1) a third party directly infringed the plaintiff's copyright; (2) the defendant knew that the third party was directly infringing; and (3) the defendant materially contributed to or induced the infringement." Leonard v. Stemtech Int'l Inc., 834 F.3d 376, 387 (3d Cir. 2016).

Daniels-Butler argues that Plaintiff fails to plead plausible facts to state a claim for contributory copyright infringement. (Doc. No. 54 at 39-40.) This Court agrees.

Plaintiff contends that the SAC contains facts stating a claim for direct copyright infringement against Fox Defendants. (Doc. No. 60 at 30.) A claim of contributory infringement "cannot stand without plausible allegations of third-party direct infringement." Parker v. Yahoo!, Inc., 2008 WL 4410095, at *5 (E.D. Pa. Sept. 25, 2008) (citing Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 930 (2005)). As discussed above, Plaintiff has not pled plausible facts alleging a claim for direct copyright infringement against Fox Defendants.

Because Plaintiff has failed to plead such facts showing that Fox Defendants directly infringed on his copyright of *Cream*, he cannot state a claim for contributory copyright infringement against Daniels-Butler. For this reason alone, this contributory copyright infringement claim will be dismissed.[14]

## V. CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss (Doc. Nos. 53-54) will be granted in the entirety. An appropriate Order follows.

---

[14] Plaintiff requested that he be granted leave to further amend the SAC. (Doc. No. 60 at 48.) Federal Rule of Civil Procedure 15(a) provides that "leave [to amend] shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility. In re Burlington Securities Litigation, 114 F.3d 1410, 1434 (3d Cir. 1997). For example, "a district court need not grant leave to amend a complaint if 'the complaint, as amended, would fail to state a claim upon which relief could be granted.'" Kundratic v. Thomas, 407 F. App'x 625, 630 (3d Cir. 2011) (quoting Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000)).

After reviewing the procedural history of this case, it is clear that allowing Plaintiff to amend his complaint once again would be futile. On January 8, 2016, Plaintiff initiated this action. (Doc. No. 1.) He filed an Amended Complaint on January 29, 2016. (Doc. No. 3.) On June 17, 2016, Defendants filed two Motions to Dismiss the Amended Complaint. (Doc. Nos. 21, 25). The Court held a hearing on Defendants' Motions to Dismiss on June 2, 2016. (Doc. Nos. 41-42.) At the hearing, this Court afforded Plaintiff with another opportunity to amend the Amended Complaint. On August 1, 2016, Plaintiff filed a Second Amended Complaint ("SAC"). (Doc. No. 45.) Upon the filing of the SAC, the Court denied Defendants' pending Motions to Dismiss without prejudice as moot. (Doc. No. 46.)

On September 30, 2016, Defendants filed two Motions to Dismiss the SAC. (Doc. Nos. 53-54.) Plaintiff filed Responses in Opposition on October 30, 2016. (Doc. Nos. 57-60.) On November 14, 2016, Defendants filed Replies. (Doc. Nos. 62-63.) This Court held a hearing on the Motions to Dismiss the SAC. (See Doc. No. 69.) At the hearing, the Court granted the parties leave to file supplemental briefs. (Id.) On March 27, 2017, Plaintiff and Defendants filed supplemental briefs on the Motions to Dismiss. (See Doc. Nos. 80-84.) Thus, at this point, there has been not one, but two rounds of motions practice and oral argument on Defendants' Motions to Dismiss. Plaintiff has filed three different complaints in this action, and has had two opportunities to amend the Complaint. Further amendment will not cure the defects in the claims raised. Consequently, amending the SAC again would be futile and leave to amend will not be granted.